UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA


United States of America,                                    Criminal No. 09-298 (MJD/FLN)


                    Plaintiff,


          v.                                                 **REPORT AND**
                                                             **RECOMMENDATION**
**15- Timothy Williams**,
**16- Jessie Danielle Capers,**


                    Defendants.


_____

          Steven L. Schleicher, Assistant United States Attorney, for the Government.
                    Thomas G. Dunnwald for Defendant Williams.
                    William G. Selman, III for Defendant Capers.
_____


          **THIS MATTER** came before the undersigned United States Magistrate Judge on

January 7, 2010, on Defendant Williams' Motion for Disclosure of Any Legal or Illegal

Electronic Surveillance and Suppression [#283], Motion for Suppression of Search and Seizure

Evidence [#285], Motion to Suppress Statements [#286], Motion for Translation or Suppression

of Communications [#406], and Defendant Capers' Motion to Suppress Statements, Admissions

and Answers [#352], and Motion to Suppress Evidence Obtained as a Result of Search and

Seizure [#353]. The Court received testimony from Troy Greene, Christopher Hage, Christian

Freichels, and Scott Schneider, and the Government submitted exhibits into evidence during the

course of the hearing.[1]

_____

[1] Government's Exhibit 1 is a DVD recording of a traffic stop; Government's Exhibit 2 is a photocopy of "Oral Warnings to be Given to a Subject Prior to Interrogation" labeled DEA - 13A; Government's Exhibit 3 is an audio recording labeled "J. Capers;" and Government's Exhibit 4 is an audio recording labeled "T. Williams."

The parties have since submitted supplemental briefs on the issues before the Court. (Doc. Nos. 478, 480 and 488.)

The matter was referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends Defendants' suppression motions be **GRANTED, in part, and DENIED, in part**.

## I.   FINDINGS OF FACT

Timothy Williams and Jessie Danielle Capers ("Defendants") have been indicted and charged with one count of Conspiracy to Distribute, and Possess with Intent to Distribute, 5 kilograms of cocaine or more and 50 grams of methamphetamine or more between January 2008 and October 2009, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) and 846. (Doc. No. 1, Indictment.)

### A.   Testimony of Task Force Officer Troy Greene

DEA Task Force Officer Troy Greene testified that he was familiar with Defendants pursuant to an approximately 60-day long, wiretap investigation that started in or about the summer of 2009. During the investigation, Officer Greene determined that Enrique Garcia ("Garcia") was the leader of a narcotics operation, which dealt mostly in the distribution of cocaine. Officer Greene testified that Garcia would receive phone calls from customers placing drug orders and would then direct Sergio Lozada ("Lozada"), also known as "Jimmy the Driver," to pick up the drugs from a stash location and deliver them to his clients. During the investigation, officers obtained wiretap authorization for multiple telephones,[2] including target phones 3 and 4, used by Garcia.

---

[2] Officer Greene testified that neither Defendant Capers' nor Defendant Williams' phones were wiretapped during the course of the investigation. He further testified that Defendant Capers' voice did not appear on any wiretap recordings during the investigation, however, the record is unclear as to whether Defendant Williams' voice

### 1. September 8, 2009

Officer Greene testified that, on September 8, 2009, law enforcement intercepted a phone call on target phone 3 between Garcia and Jasmine Hall ("Hall"). At 2:35 P.M., officers overheard an English language call during which Hall indicated he was waiting on "his cousin"[3] to conduct a transaction later in the day. Hall indicated that he expected a call from "his cousin" at approximately 8 P.M. that night.

Officer Greene testified that surveillance teams then went to Hall's address "on Charles" and to the known stash house location on Holly Street in Saint Paul Park. Subsequently, officers observed Hall arrive at the Charles address in a Ford Expedition, a vehicle law enforcement knew him to drive, accompanied by two other males. Shortly thereafter, surveillance observed Hall leave the Charles address. Law enforcement followed the vehicle to a park in West Saint Paul, where a meeting took place between Hall and an occupant of a white Cavalier, driven by a female. A surveillance team watched a bald, black male with glasses and facial hair exit the Cavalier and meet with Hall at the park, while the driver remained in the vehicle. Officer Greene testified that the meeting took place between 7:47 P.M. and 8:08 P.M., after which Hall traveled to another apartment complex in Saint Paul. Officer Greene, however, was not a member of the surveillance team on that date.

Law enforcement recorded the Minnesota license plate number of the white Cavalier and determined that the registered owner of the vehicle was Defendant Capers.

### 2. October 16, 2009

Beginning at about 3:03 P.M. on October 16, 2009, law enforcement intercepted a series

---

was recorded pursuant to wiretaps.
  [3] Officer Greene testified that he was familiar with the usage of the term "cousin" as not only one's blood relative but sometimes one's friend or "guy." In this case, he was not able to determine the intended meaning of the

of calls between Garcia and Hall on target phone 4, during which Hall and Garcia coordinated, in English, a meeting between Hall's "cousin" and Garcia for the purpose of purchasing "nine," which Officer Greene testified he believed to mean nine ounces of cocaine. At 3:27 P.M., Garcia called Lozada and instructed him, in Spanish, to "come to the house, dude, get the nine and come over. The black guys are on their way over here." The call was translated into English by Spanish-speaking interpreters.

At 3:30 P.M., surveillance officers saw Lozada leave his apartment complex driving a black Toyota pickup and arrive at the stash house on Holly Street. At 3:41 P.M., Garcia called Hall on target phone 4 and asked Hall if Hall's "cousin" was on his way, to which Hall responded that he was. Officer Greene testified that, about 4 minutes later, Garcia received a call from Hall, who said that his "cousin" was pulling up, and Garcia stated that he was "by the balcony." At 3:50 P.M., Garcia received a call on target phone 4 from Lozada, who indicated he was on his way. Then, at 4:05 P.M., surveillance observed Lozada leave the stash house on Holly Street in the black pick up. Meanwhile, a separate surveillance team observed a white Cavalier, driven by a black female with a black male passenger, pull into a parking spot at Garcia's apartment building at an address on "Upper 55th." At that time, Officer Fletcher reported to Officer Greene that he recognized the white Cavalier and its occupants from the meeting with Hall at the park, which occurred approximately one month prior. The white Cavalier remained in the parking spot for 20 to 25 minutes, during which the driver remained in the vehicle.

Officer Greene testified that "surveillance reported the male passenger exiting the vehicle and walking up to what would be the balcony area on the ground level." The male passenger and Garcia then met on the patio walk-out from the ground level apartment. Soon afterward,

---

term.

Lozada's vehicle pulled into the same lot and parked. Lozada then joined in the meeting between Garcia and the male passenger (later identified as Defendant Williams).

Officer Greene testified that he did not know what, if anything, the passenger carried with him as he approached the apartment. He also acknowledged that nothing in the report indicates that surveillance observed the passenger carrying anything when he left the apartment building[4] and re-entered the white Cavalier. Officer Greene further explained that he was communicating with surveillance by radio throughout the event and not every communication between him and surveillance was included within his report.

Officer Greene testified that the observed behavior was consistent with the passenger of the vehicle paying Garcia for the drugs, which would have been retrieved from the stash house by the driver, Lozada, and subsequently delivered to Defendant Williams before he placed them in the Cavalier. Officer Greene testified that he was not told, however, that surveillance had visually confirmed a hand-to-hand transfer of drugs.

Based on all of the phone calls, including the discussion of "nine," the observations of surveillance, the meeting between Defendant Williams, Garcia and Lozada, and the time frames within which the events occurred, "there was no question in [Officer Greene's] mind that a drug transaction for nine ounces of cocaine at that time had occurred."[5]

Once the vehicle pulled away, surveillance was able to confirm the license plate on the white Cavalier as that registered to Defendant Capers. Officer Greene then provided Trooper Schneider with the description and license plate of the Cavalier and instructed him to stop the vehicle. He further testified that Defendants' "identities were not known until the traffic stop."

---

[4] It is unclear from the record whether any part of the meeting was conducted inside the apartment building or if it was limited to the outdoor exchange.
[5] Officer Greene testified that he believed the translations and information he received from surveillance

At the time of the stop, Officer Greene directed Trooper Schneider "not to let [Defendants] go," and testified that the trooper "continued his search under my direction." Ultimately, nine ounces of cocaine were found under dash compartment in the front passenger area of the Cavalier, which Officer Greene testified would be about the size of a softball.

**B.     October 16, 2009 Traffic Stop**

    **1. Testimony of Trooper Scott Schneider**

      **a. Circumstances of the Stop**

On October 16, 2009, Minnesota State Trooper Scott Schneider received a call from the DEA requesting that he be available to conduct a traffic stop in the City of Inver Grove Heights on a "white, Chevrolet Cavalier" with a specific license plate number. He was informed that the Cavalier would be arriving at a residence in Inver Grove Heights and would be leaving that location "with a large amount of cocaine." He testified that he was then asked [by the DEA] to conduct a traffic stop on the vehicle "and try and make it look as routine as possible so the occupants of the vehicle would not suspect the ongoing investigation." Trooper Schneider testified: "I was to tell them a legitimate reason for the stop," and "if a reason could not have been found, yes, the vehicle was going to be stopped." He acknowledged that he intended to detain Defendants at the time of the stop.[6]

Trooper Schneider first saw the white Cavalier shortly after 4 P.M. and proceeded to follow it for a period of time. He observed that "the vehicle's wipers had been intermittently activated and there was a slight mist . . . and rain, precipitation, however, the vehicle's headlights were not activated," which constitutes a violation of Minnesota statute. He also "obtained a

---

officers were reliable.
    [6] Additionally, when asked on cross-examination: "They [Defendants] were not free to leave?," Trooper Schneider responded: "Correct."

speed reading of 62 miles per hour" on the vehicle in a 55 mile per hour zone on Highway 52.

At 4:22 P.M., Trooper Schneider activated his emergency lights, which triggered the squad car video camera (*see* Gov't Ex. 1), and proceeded to stop the vehicle. He identified the female driver by her Minnesota driver's license as Defendant Capers and the male passenger by name and date of birth as Defendant Williams. Trooper Schneider asked Defendant Capers to exit the vehicle, and while speaking with Defendant Capers outside the vehicle, he saw "the male passenger moving frantically from side to side and ducking down as if he was trying to hide something." Trooper Schneider testified that he approached the passenger door, opened the door, asked the passenger what he was hiding and became concerned when Defendant Williams' "hands went inside his jacket pockets." Although none of the agents involved in the investigation indicated that Defendants were carrying weapons, Trooper Schneider testified that he was concerned that Defendant Williams was trying to retrieve a gun or that he was "going for something." He then drew his firearm and ordered Defendant Williams out of the vehicle. Pursuant to a pat down search, Trooper Schneider did not recover any weapons, but found three or four cell phones in Defendant Williams' jacket and "a large bundle of currency in his pants pocket."

Trooper Schneider testified that he explained the reason for the stop to Defendant Capers, at which time she admitted to "speeding and going 60 miles per hour in a 55 mile per hour zone." He further testified that "she appeared abnormally nervous for being stopped for traffic violations," broke eye contact, and stuttered when she spoke. She told Trooper Schneider that she was coming from a female friend's house, but "she did not know how long she had known the passenger."

She then relayed that her proof of insurance was in the vehicle's center console, which

Trooper Schneider testified was directly next to the area Defendant Williams was seated when he made frantic movements. He explained his concern for her "going in the area that I had seen Mr. Williams reaching, and asked her if it would be OK if I would just take a look in the center console before she removed her proof of insurance." She permitted him to do so. Trooper Schneider then asked Defendant Capers if there were narcotics in the vehicle, and he testified that, when asked about cocaine specifically, she broke eye contact. He testified that he asked Defendant Williams the same questions, with the same response.

He then asked for consent to search the vehicle. Defendant Williams indicated that he "didn't care," but stated that the car was not his. Trooper Schneider testified that, when he asked Defendant Capers for consent to search, "[s]he made it clear that she didn't want me using my narcotics dog or going in the vehicle."

### b. Narcotics Dog Sniff and Vehicle Search

Trooper Schneider testified that his dog, "Bandit," is trained and certified in narcotics detection. During the stop in this case, he used Bandit to conduct a sniff on the vehicle. Bandit then alerted[7] to the "odor of controlled substance on the exterior of the vehicle." Trooper Schneider described that, while at the front passenger door, Bandit stopped following him, "took deep breaths and intensely stared at the window." Trooper Schneider believed the dog was alerting to odor of controlled substance. He testified that the dog then jumped through the open passenger window without a command to do so. Bandit then sniffed the dashboard area and went down underneath the glove box, in an effort to reach the source of the odor.

---

[7] Trooper Schneider testified that the terms "alert" and "indicate" have different meanings within the context of a narcotics dog sniff. The behavior of a dog when he "first comes into contact with the odor"—in this case, where the dog stopped following him and stayed at the door as the trooper continued to walk—is considered an "alert." Once a dog "pinpoints the area of the smell" and tries to get at its source—in this case, when the dog was inside the vehicle and trying to get under the dashboard, biting and barking—is considered an "indication."

Trooper Schneider subsequently conducted a search of the passenger compartment of the vehicle. He recovered two tablets of ecstasy from under the gear shifter near the center console as well as a softball-sized amount of cocaine "almost in brick form," packaged in a plastic grocery store bag. The cocaine was retrieved from the area under the glove box, "up in the dashboard," which he later determined weighed about 9.5 ounces.

Trooper Schneider reported to DEA investigators by radio, who instructed him to arrest Defendants and transport them to the Ramsey County Jail. He testified that he took the contraband with him and told Defendants they were under arrest for the ecstasy found in the vehicle. He further testified that he did not provide either Defendant with a *Miranda* advisory. Trooper Schneider transported Defendant Capers to the jail, while Defendant Williams traveled in a different vehicle.

### 2. Squad Car Video

For the most part, the squad car video is consistent with the testimony of Trooper Schneider. (*See* Gov't Ex. 1.) Once outside the vehicle, Defendants are separated by Trooper Schneider and remain separated throughout the duration of the stop. *See id.* It is unclear from the video if Defendants averted eye contact when asked about cocaine, however, they do not appear to change their behavior in any way during this line of questioning. *See id.*

When asked by Defendants why he wants to search the vehicle, Trooper Schneider responds "because of my observations." *Id.* Once he begins the dog sniff, the video shows Trooper Schneider circling the white Cavalier counterclockwise, beginning on the passenger side of the vehicle. *Id.* As he moves, he makes an up and down hand motion, apparently presenting areas of the vehicle to the dog. *Id.* At the time of the dog sniff, the vehicle's doors are closed, however, the front passenger window (and likely the driver's window) is open. *Id.* It appears

from the video that, the first time around, the dog hesitates only slightly, if at all, at the passenger door before continuing. *Id.* The second time around, however, after a similar series of hand motions by Trooper Schneider, the dog jumps up and through the open passenger window, into the passenger compartment of the vehicle. *Id.* Although the dog's subsequent actions are not visible on the video, the dog is heard barking from within the car. *Id.*

Once the dog is removed from the vehicle, Trooper Schneider asks Defendant Williams: "What's on your side of the vehicle? Somebody smoke some weed in there or why's my dog excited?" *Id.* Defendant Williams states that Defendant Capers "had some weed earlier" and asks her, from a distance, where is "that little blunt?" *Id.* She tells the trooper it may be in the ashtray. *Id.*

Trooper Schneider directs Defendants to sit in what appear to be separate squad vehicles and tells Defendant Williams that it's starting to rain, and he doesn't want him to get wet. *Id.* He then begins his search of the passenger compartment of the Cavalier. *Id.* He first finds "two tabs of X" and then appears to find the cocaine. *Id.* Another trooper is visible on the scene, however, he does not participate in the search or questioning of Defendants. *Id.* Trooper Schneider is then heard to say he "found the brick in the dash" and can be seen putting something in his back pocket. *Id.* Upon exiting the vehicle, it appears that Trooper Schneider turns off his microphone.[8] *Id.* He then tells Defendant Capers that he found "a couple tabs of ecstasy," tells her she's under arrest, and transports her from the scene in his vehicle. *Id.*

### C.    October 16, 2009 Interviews

#### 1.  Testimony of Officer Christian Freichels

DEA Task Force Officer Christian Freichels testified that he interviewed Defendants on

---

[8] Trooper Schneider testified, however, that he does not recall if he turned off his microphone at any point.

October 16, 2009 at the Ramsey County Jail. He issued a *Miranda* warning to both Defendants, who indicated that they understood their rights and agreed to speak with Officer Freichels. Both statements were recorded. (*See* Gov't Exs. 3 and 4.)

Officers Freichels testified that Defendant Williams did not show signs of intoxication and did not appear to be impaired or confused. He further testified that Defendant Williams appeared to be a person of average intelligence and that he had no reason to question his competence.

Officer Freichels testified that he was confident Defendant Capers understood the questions asked of her, despite her emotional state. He testified that, although she stated that she had "had some problems" at the jail, he did not see any physical evidence that she had been assaulted.

After the interviews, both Defendants were released pending the investigation. To Officer Freichels' knowledge, neither Defendant was aware that cocaine had been recovered from the vehicle. Officer Freichels discussed the ecstasy found in the car, but not the cocaine, and neither Defendant brought up the existence of the cocaine during the interviews.

### 2. Interview Recordings

On the recordings, Officer Freichels asks each Defendant a series of biographical questions (including name, date of birth, employment status and education history) and then proceeds to recite their rights. (Gov't Exs. 3 and 4.). After the reading of each right, Officer Freichels indicates that Defendants "don't need to initial, but just tell me if you understand each of these rights." Both Defendants acknowledge, with a "yes," that they understand each of their rights. After the rights advisories in both interviews, he advises Defendants that the decision to

"talk" is theirs to make.[9]

During Defendant Capers' interview, Officer Freichels asks: "What were you guys doing? Where were you coming from?" to which Defendant Capers responds: "I'm done answering questions I'm sorry bye," but she continues to speak, uninterrupted, saying that she "didn't do anything." Officer Freichels then asks Defendant Capers to "tell me what happened here." Defendant Capers relates that she was at a friend's house and later admits to smoking marijuana and using ecstasy in the past. Defendant Capers appears to be agitated and emotional throughout the interview.

### D. Testimony of Agent Christopher Hage: October 21, 2009 Interviews

DEA Special Agent Christopher Hage testified that he interviewed both Defendants at the U.S. Marshal's Office in Saint Paul on October 21, 2009 and issued *Miranda* warnings to each, consistent with that of Government Exhibit 2. (*See* Gov't Ex. 2.) The interviews were not audio or video recorded. Agent Hage testified that he identified himself as law enforcement to Defendant Williams, who invoked his right to counsel after hearing the *Miranda* warning. Defendant Capers, however, agreed to speak with Agent Hage, despite the *Miranda* warning.

After identifying himself as a DEA Agent to Defendant Capers, he filled out DEA form 202, which is a biographical information form including name and date of birth, while Task Force Officer Potter obtained a digital voice exemplar.[10] Agent Hage testified that Capers' voice was recorded briefly during biographical questioning and then the recording was turned off. He further testified that he did not recall if he read the *Miranda* warning before or after the

---

[9] Officer Freichels states to Defendant Capers: "I'll tell you why I'm here, and it's up to you if you want to talk to me about it." (Gov't Ex. 3). He states to Defendant Williams: "If you want to talk about it you can, it's up to you." (Gov't Ex. 4).

[10] Agent Hage testified that the exemplar consisted of the responses to the DEA 202 biographical form, including "first name, last name, date of birth, etc." He stated that it is general practice for the agent to fill out the

biographical questioning, but that it is "usually my practice to read it after the exemplar because the DEA 202 is not an interrogation form, it's just biographical."

Agent Hage testified that Defendant Capers appeared to understand the questions asked of her and did not appear intoxicated, despite the fact that she was emotional. She asked sensible, logical questions and responded appropriately to Agent Hage's inquiries. According to Agent Hage, the interview lasted approximately 20 minutes.

## II.      CONCLUSIONS OF LAW

### A. The October 16, 2009 Drug Dog Sniff and Subsequent Vehicle Search Were Valid.

The automobile exception allows officers to conduct a warrantless search of a vehicle when they have probable cause to believe it contains contraband or evidence of criminal activity. *See e.g. California v. Carney*, 471 U.S. 386, 390 (1985).   Probable cause exists where there is a "fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates,* 462 U.S. 213, 238 (1983). Determining whether probable cause exists at the time of the search is a "commonsense, practical question" to be judged from the "totality-of-the-circumstances." *Id.* at 230. "Probable cause does not require evidence sufficient to support a conviction, nor even evidence demonstrating that it is more likely than not that the suspect committed a crime." *United States v. Donnelly*, 475 F.3d 946, 954 (8th Cir. 2007).

The use of a "drug-sniffing dog on the exterior of a vehicle during a valid traffic stop does not infringe upon any Fourth Amendment rights." *United States v. Williams*, 429 F.3d 767, 772 (8th Cir. 2005), citing *Illinois v. Caballes*, 543 U.S. 405 (2005). Thus, a dog sniff of the exterior of a vehicle does not constitute a search for Fourth Amendment purposes and, therefore,

---

form as the questions are answered. The exemplar was used to compare Defendant Capers' voice to other voices recorded in the investigation.

requires neither probable cause nor reasonable suspicion. *See e.g. Williams*, 429 F.3d at 772; *United States v. Gregory*, 302 F.3d 805, 810 (8th Cir. 2002). A dog sniff by a reliable dog, which results in an alert on a car, however, gives an officer probable cause to believe that there are drugs present, standing alone. *Donnelly*, 475 F.3d at 955, citing *United States v. Sundby*, 186 F.3d 873, 875–76 (8th Cir. 1999) (holding that an affidavit stating that a dog has been trained and certified to detect drugs is sufficient to establish a dog's reliability).

Although in the case at hand, Defendant Capers did not consent to a search of her vehicle, her consent was not necessary for the dog sniff conducted on the exterior of the Cavalier. The dog, trained and certified in narcotics detection, then alerted to the passenger door of the vehicle, which created independent probable cause to conduct a search for controlled substances.

Moreover, the fact that the passenger window of the vehicle was open, creating an opportunity for the dog to breach the interior of the vehicle, did not render the search unlawful. *See United States v. Lyons*, 486 F.3d 367, 373 (8th Cir. 2007) (holding that a canine search of a vehicle was not rendered illegal, under the Fourth Amendment, by the fact that the vehicle's windows were open where the passenger window was opened by the passenger without any order or request from the trooper, the trooper did not order that the windows remain open, and the canine's handler did not direct the canine to stick his head through the window). *But see United States v. Winningham,* 140 F.3d 1328, 1329–31 (10th Cir. 1998) (holding a search illegal where *officers* opened the door of a suspect's van, given that an officer may not open a vehicle to create the opportunity for a drug dog to go where the officer himself cannot go, although a suspect may). The squad car video confirms that Trooper Schneider did not order the passenger window to remain open. (*See* Gov't Ex. 1.)

Although it is unclear from the video whether the dog entered the vehicle pursuant to a

non-verbal command, assuming, without deciding, that Trooper Schneider directed the dog through the open passenger widow, any such command did not invalidate the subsequent search. This Court finds that, as the open window was the strongest source of the odor, there is little doubt that the dog would have ultimately detected the narcotics, "even if he had been reined back and held outside the plane of the window track." *Lyons*, 486 F.3d at 374 (upholding a district court's finding that the dog would have inevitably smelled the odor of drugs).

Trooper Schneider had independent probable cause to search the vehicle for narcotics once the dog alerted to the odor in the passenger compartment. Evidence seized pursuant to the search of the vehicle on October 16, 2009 is, therefore, admissible.

### B. Statements

The next issue before the Court is whether Defendants' statements to law enforcement on October 16, 2009 and October 21, 2009 should be suppressed.

Before any evidence obtained as a result of a custodial interrogation may be used against a defendant at trial, the Fifth Amendment requires that a defendant in custody and subject to interrogation by law enforcement be advised of his constitutional rights and that he make a knowing, intelligent and voluntary waiver of those rights. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Before questioning begins, a suspect in custody must be informed of the following: (1) that he has the right to remain silent; (2) that his statements may be used against him in a court of law; (3) that he has the right to an attorney; and (4) that if he cannot afford an attorney, one will be appointed. *Id.* at 444, 469–70, 478–79. Law enforcement officials must use either this formulation of the warnings or "other procedures [that] are at least as effective in apprising accused persons of their right of silence and in assuring a continuous opportunity to exercise it." *Id.* at 467. After the warnings are given, if the suspect indicates that he wishes to assert these

rights, the interrogation must stop. *Id.* at 473–74. Statements elicited from a suspect in violation of *Miranda* are inadmissible. *Stansbury v. California*, 511 U.S. 318, 322 (1994).

Once advised of his *Miranda* rights, a suspect's waiver of his Fifth Amendment privilege against self-incrimination is only valid if it is voluntarily, knowingly, and intelligently made. *Miranda*, 384 at 444; *United States v. Syslo*, 303 F.3d 860, 866 (8th Cir. 2002). A waiver is made knowingly if it is "made with a full awareness of both the nature of the right being abandoned and the consequences of the decision to abandon it." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). It is voluntary if it is "the product of a free and deliberate choice rather than intimidation, coercion, or deception." *Id*. It is the Government's burden to show by a preponderance of evidence that the suspect's waiver meets these standards. *Miranda*, 384 U.S. at 473; *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

A court determines whether *Miranda* rights were knowingly and voluntarily waived under a totality of the circumstances test. *Tippitt v. Lockhart*, 859 F.2d 595, 598 (8th Cir. 1988). The court looks to such factors as the age and education level of the defendant, lack of advice as to constitutional rights, length of detention, "repeated and prolonged nature of questioning," and the use of physical punishment. *Id*.

### 1. October 16, 2009 Statements

#### a. Pre-*Miranda* Traffic Stop Statements Must Be Suppressed.

Here, it is uncontested that Trooper Schneider did not recite the *Miranda* warning to Defendants at any time during his traffic stop on October 16, 2009. The question of admissibility, with respect to statements made during the traffic stop, therefore, turns on whether Defendants were in custody at that time.

The test for determining whether a roadside traffic stop amounts to a custodial

interrogation subject to *Miranda* is whether the "traffic stop exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights." *Berkemer v. McCarty,* 468 U.S. 420, 437 (1984). "If a motorist who has been detained pursuant to a traffic stop thereafter is subjected to treatment that renders him 'in custody' for practical purposes, he will be entitled to the full panoply of protections prescribed by *Miranda.*" *Id.* at 440. The relevant inquiry, therefore, "is how a reasonable man in the suspect's position would have understood his situation." *Id.* at 442.

In the instant case, the stop, as conducted, was not an ordinary traffic stop. In fact, Trooper Schneider testified that the vehicle would have been stopped even if he could not find an independent, "legitimate reason" to pull the vehicle over. Trooper Schneider conceded that Defendants were detained from the time he initiated the stop. At no time were they free to leave.

Therefore, this Court finds that Defendants were in custody from the time Trooper Schneider pulled over the Cavalier and were thus entitled to a *Miranda* warning prior to any questioning from law enforcement. Because no such warning was administered at the time of the stop, all statements made by Defendants to Trooper Schneider on October 16, 2009 must be suppressed.

### b. Recorded Interview Statements Made On October 16, 2009 Should Not Be Suppressed.

This Court finds that both Defendants knowingly and voluntarily waived their *Miranda* rights on October 16, 2009. (*See* Gov't Exs. 3 and 4.) Consequently, all post-*Miranda* statements on that date are admissible.

Although Defendants did not sign waiver of rights forms after hearing the *Miranda* advisory, they both acknowledged that they understood each of their rights. Also, Officer

Freichels testified that Defendants did not appear impaired in any way and appeared to understand the questions posed to them. Neither Defendant requested an attorney at any time during the interviews. Additionally, Defendant Williams never expressed discomfort or asked to stop the interview, and any discomfort expressed by Defendant Capers did not amount to an invocation of her right to silence.

### i. Defendant Capers Did Not Invoke Her Right To Silence.

Defendant Capers contends that her statement and waiver were not knowing and voluntary given her emotional state at the time of questioning. She further argues that she invoked her right to silence during the interview.

A suspect invokes her right to remain silent by making "a clear, consistent expression of a desire to remain silent." *United States v. Thompson*, 866 F.2d 268, 272 (8th Cir. 1989). "Indirect, ambiguous, and equivocal statements or assertions of an intent to exercise the right to remain silent are not enough to invoke that right for the purposes of *Miranda*." *United States v. Ferrer-Montoya*, 483 F.3d 565, 569 (8th Cir. 2007), citing *United States v. Johnson*, 56 F.3d 947, 955 (8th Cir. 1995); *see Mann v. Thalacker*, 246 F.3d 1092, 1100 (8th Cir. 2001) ("Being evasive and reluctant to talk is different from invoking one's right to remain silent."). The question of whether a suspect invoked her right to remain silent is a factual determination for the district court. *Ferrer-Montoya*, 483 F.3d at 569.

Officer Freichels read Defendant Capers her *Miranda* rights, after which she indicated that she understood each right, and was initially receptive to talking about her arrest. (Gov't Ex. 3.) Although she did say: "I'm done answering questions I'm sorry bye," midway through the interview, this statement was part of a much longer, uninterrupted narrative. *See id.* In fact, immediately after expressing her desire to stop answering questions, Defendant Capers

proceeded to proclaim her innocence and speak at length about her situation, unprovoked by Officer Freichels. *See id.* Therefore, she expressed, at most, an ambiguous and equivocal desire to remain silent, insufficient to "invoke that right for the purposes of *Miranda.*" *Ferrer-Montoya*, 483 F.3d at 569.

In sum, this Court finds that Defendant Capers did not invoke her right to silence. Therefore, suppression of her statements to Officer Freichels on October 16, 2009 is not warranted.

### ii. Biographical Statements Are Admissible.

"It is well-settled that routine biographical data is exempted from *Miranda*'s coverage." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996); *see Pennsylvania v. Muniz*, 496 U.S. 582, 601 (1990). "A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if the information turns out to be incriminating." *United States v. McLaughlin*, 777 F.2d 388, 391–92 (8th Cir. 1985). If, however, the government agent "should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged," the question will be subject to scrutiny. *Id.*; *see Muniz*, 496 U.S. at 602 n. 14 (holding that, during booking procedures, government agents may not ask questions "that are designed to elicit incriminatory admissions"); *United States v. Robinson*, 441 F. Supp. 2d 1029, 1043 (D. Minn. 2006); *see also United States v. Scott,* 270 F.3d 30, 44 (1st Cir. 2001) (determining that questions about age and residence were interrogation not fitting routine booking exception because officer knew answers would likely produce inculpatory information), *cert. denied* 535 U.S. 1007 (2002); *United States v. Henley*, 984 F.2d 1040, 1042–43 (9th Cir. 1993) (holding that an officer asking whether a suspect owned a vehicle was interrogation when officer had reason to

believe the vehicle was involved in illegal activity).

Because biographical questions were not designed to elicit incriminatory admissions in this case, the answers to all pre-*Miranda* biographical questioning on October 16, 2009 and October 21, 2009 are admissible.

### 2. October 21, 2009 Questioning

For the reasons set forth above, any pre-*Miranda* biographical statements made to law enforcement by Defendants on October 21, 2009 are admissible. Any statements made after Defendant Williams invoked his right to counsel, however, must be suppressed.

With respect to Defendant Capers' post-*Miranda* statements, this Court finds Agent Hage's testimony to be credible and finds that Defendant Capers knowingly and voluntarily waived her *Miranda* rights at the time of the interview. Defendant Capers has failed to raise any specific issues warranting suppression with respect to her interview with Agent Hage. (*See* § C Below.) Therefore, Defendant Capers' statements to Agent Hage on October 21, 2009 are admissible.

### C. Defendant Williams Has Not Met His Burden In Bringing His Additional Motions To Suppress.

Apart from the issues addressed above, Defendant Williams has additionally filed a Motion for Disclosure of Any Legal or Illegal Electronic Surveillance and Suppression [#283] and a Motion for Translation or Suppression of Communications [#406]. To the extent these motions raise discovery requests, the motions have been addressed in this Court's January 24, 2010 Order. (Doc. No. 496.) To the extent the motions seek suppression of surveillance and communications, this Court finds that Defendant Williams has not met his burden.

"It is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *See e.g. United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977), *cert. denied* 431 U.S. 932 (1977). Of course, where a defendant seeks to suppress evidence as the fruit of an illegal search, the ultimate burden of persuasion may shift to the Government "upon an initial showing of certain facts by the defendant." *De la Fuente*, 548 F.2d at 533. Even in circumstances in which the Government bears the ultimate burden of persuasion, however, "the defendant must first discharge his initial burden of producing some evidence on [sic] specific factual allegations sufficient to make a prima facie showing of illegality." *Id.* at 534; *see e.g. Nardone v. United States*, 308 U.S. 338, 341 (1939) ("The burden is, of course, on the accused in the first instance to prove to the trial court's satisfaction that wire-tapping was unlawfully employed.")

Thus, despite the fact that the Government may have "the ultimate burden of persuasion to show that its evidence is untainted" once an illegal search has come to light, defendants seeking to suppress evidence must present "specific evidence demonstrating taint." *Alderman v. United States*, 394 U.S. 165, 183 (1969); *see Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, but on the government to justify a warrantless search.") (citations omitted); *see also United States v. Edwards*, 563 F. Supp. 2d 977, 994 (D. Minn. 2008) ("At the end of the day, as the moving party, at a minimum it is defendant's burden to come forth with some evidence and argument to support his position that evidence, statements or a witness identification should be suppressed.").

Defendant has presented to this Court no such evidentiary support for his claim that suppression of wiretapping and communications is warranted. Had he done so, the ultimate

burden of persuasion to show that its evidence is untainted would have shifted to the Government. *See Alderman*, 394 U.S. at 183.

Because the record is silent, the outcome of the suppression motions on these bases turns on the determination of the question of the parties' respective burdens. Here, Defendant Williams bears the initial burden to put forth some "specific evidence demonstrating taint," in this case, by presenting some evidentiary support for any argument that allegedly unlawful wiretapping or translation took place and, thus, requires suppression. *See id.* Defendant Williams has failed to make the necessary "initial showing," by affidavit, testimony or otherwise, that the wiretapping was unlawful. *See de la Fuente*, 548 F.2d at 534. Instead, he has only argued for its disclosure, including the discovery of translations. (Doc. No. 478, 6–7.) He has, therefore, failed to carry his burden and is consequently entitled to neither a suppression of the wiretap evidence nor an additional evidentiary hearing on the issue of suppression. *See id.*; *United States v. Losing*, 539 F.2d 1174, 1177–79 (8th Cir. 1976).

Because Defendant Williams has failed to meet his burden in bringing his motion to suppress surveillance and communications, this Court finds that suppression is not warranted.

## III.  RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendants' Motions to Suppress be **GRANTED, in part, and DENIED, in part,** as follows:

1.  Defendant Williams' Motion for Disclosure of Any Legal or Illegal Electronic Surveillance and Suppression [#283] should be **DENIED** to the extent Defendant Williams seeks to suppress surveillance.

2.  Defendant Williams' Motion for Suppression of Search and Seizure Evidence

[#285] should be **DENIED**.

3.     Defendant Williams' Motion to Suppress Statements [#286] should be **GRANTED** to the extent Defendant Williams seeks to suppress any pre-*Miranda* statements made to law enforcement during the traffic stop on October 16, 2009 as well as any statements made after he invoked his right to counsel on October 21, 2009. In all other respects, the motion should be **DENIED**.

4.     Defendant Williams' Motion for Translation or Suppression of Communications [#406] should be **DENIED** to the extent Defendant Williams seeks to suppress communications.

5.     Defendant Capers' Motion to Suppress Statements, Admissions and Answers [#352] should be **GRANTED** to the extent Defendant Capers seeks to suppress any pre-*Miranda* statements made to law enforcement during the traffic stop on October 16, 2009. In all other respects, the motion should be **DENIED**.

6.     Defendant Capers' Motion to Suppress Evidence Obtained as a Result of Search and Seizure [#353] should be **DENIED**.


DATED: February 1, 2010                 *s/ Franklin L. Noel*
                                      FRANKLIN L. NOEL
                                      United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **February 5, 2010**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief on or before **February 8, 2010**. All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **February 5, 2010** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.